COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**
**NO. 02-13-00229-CV**


BYRON EARL WALKER                                              APPELLANT

V.

SHERYL LEE WALKER                                              APPELLEE

----------

FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In four issues, Appellant Byron Earl Walker appeals from a final decree of divorce.  We will affirm.

Byron and Appellee Sheryl Lee Walker married in 1986.  They separated for some time after the marriage but reunited and had three children, one of which was younger than eighteen (C.L.W.) when Byron filed for divorce in July

---

[1]*See* Tex. R. App. P. 47.4.

2011, alleging that the marriage had become insupportable. Sheryl filed a counterpetition for divorce, alleging adultery, cruel treatment, and insupportability and requesting that she be appointed the parent with the exclusive right to designate C.L.W.'s primary residence, that Byron pay her child support, and that the trial court divide the community estate.

The primary issue at the final bench trial in February 2013 concerned the division of the Walkers' community estate, which included, among other things, a residence, a 220-acre tract of land, three pickup trucks, a horse trailer, Sheryl's teacher retirement account, an investment account, personal property, credit card debt, and an $80,000 promissory note held by Farmers Bank of Newcastle. Also included in the community estate was Byron's 50% ownership interest in RWE Services, LLC, an entity that performs right-of-way mowing and construction; Byron's 50% ownership interest in BW & RR Services, LLC, an entity that owns cattle; and Byron's 25% ownership interest in Cattlemen's Land & Livestock, LLC, an entity that also runs cattle. Several witnesses testified about Byron's salary and the benefits that he receives from his employment, and Sheryl offered testimony to support her allegations that Byron had committed adultery and had treated her cruelly. The trial court signed a final decree that dissolved the Walkers' marriage, divided the community estate, outlined the conservatorship of C.L.W., and set Byron's child-support obligation. The trial court also entered findings of fact and conclusions of law.

2

In his first issue, Byron argues that the trial court abused its discretion by awarding him certain cattle that were no longer part of the community estate. He contends that the trial court erred by disregarding evidence that the cattle had been sent to a feedlot in July 2011 and sold.

We review a trial court's division of community property under an abuse of discretion standard. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Legal and factual sufficiency are not independent grounds of error here, but they are relevant factors in deciding whether the trial court abused its discretion. *Halleman v. Halleman*, 379 S.W.3d 443, 447 (Tex. App.—Fort Worth 2012, no pet.). The factfinder is the sole judge of the credibility of the witnesses and is responsible for resolving conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004).

The evidence demonstrates that Byron executed a promissory note on July 26, 2011, payable to Farmers National Bank of Newcastle in the amount of $80,000 and secured by cattle purchased by Byron. Bruce Bailey of Farmers National Bank inspected the cattle in early July 2011, shortly before Byron filed for divorce, and was led by Byron to believe that the cattle would be shipped to

3

grass and put with a bull in Oklahoma. Near the end of January 2012, Bailey sought to perform an inspection of the collateral cattle, but he experienced difficulty coordinating an opportunity to do so. According to Bailey, Byron was not entirely forthright with him when he was trying to locate the cattle. Byron eventually told Bailey that the cattle had been sent to a feedlot in Kansas and sold, but Byron did not tell Bailey what feedlot they had been sent to, and Bailey was never able to verify Byron's claim, nor did he get paid when the cattle were sold.

Sonya Bratcher, the bookkeeper for RWE, BW & RR, and Cattlemen's, testified that she performed an audit as part of a search for the cattle but that she was unable to determine where they had gone. Likewise, Sheryl testified that she did not know anything about the missing cattle or the $80,000 promissory note.

Byron testified that the cattle were sent to a feedlot in Kansas shortly after Bailey's inspection and were sold, but he had no documents evidencing the transaction, nor could he remember the name of the feedlot, the town in which it was located, or when the cattle were sold. When asked about the facts surrounding the cattle, Byron said that Sheryl had all of the documentation. Contrary to Byron's testimony that the cattle had been sent to a feedlot in July 2011, Byron executed a financial statement dated November 12, 2012— approximately three months before trial—in which he claimed to own livestock valued at $164,500. And Sheryl's inventory and appraisement, also admitted in

4

evidence, identified a similar number of cattle also valued at $164,500. Byron complains that Sheryl's inventory is inaccurate, but the trial court was responsible for weighing the evidence.

The trial court's twelfth conclusion of law, which Byron does not challenge, states that he "failed to properly account for assets." Indeed, Sheryl contends that "[t]he lower court was presented with evidence that Byron, less than three months before trial, was claiming ownership of cattle worth $164,500.00. Either he was not telling the truth at that time or he was not telling the truth to the trial court." [Footnote omitted.] Accordingly, deferring to the trial court's resolution of conflicting testimony and the inferences that reasonably could have been drawn therefrom, and considering the trial court's unchallenged conclusion; Bailey's, Sonya's, and Sheryl's testimony that they did not know what happened to the cattle; Byron's testimony that he had no documentation and knew very few facts about the feedlot transaction; and the evidence that Byron owned cattle three months before trial, we hold that the trial court did not abuse its discretion by awarding Byron the cattle. We overrule his first issue.

Byron argues in his second issue that the trial court abused its discretion by excessively and disproportionately dividing the community estate in favor of Sheryl.

The trial court shall order a division of the parties' estate in a manner that the court deems just and right, having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001 (West 2006). The property division need not be

5

equal but it must be equitable, and a trial court may consider numerous factors when exercising its broad discretion to divide the marital property, including the relative earning capacity and business opportunities of the parties, the parties' relative financial condition and obligations, the parties' education, the size of the separate estates, fault in the breakup of the marriage, and the probable need for future support. *Murff*, 615 S.W.2d at 699. A disproportionate division must be supported by some reasonable basis. *Smith v. Smith*, 143 S.W.3d 206, 214 (Tex. App.—Waco 2004, no pet.). We apply an abuse of discretion standard of review. *Murff*, 615 S.W.2d at 698.

According to Byron, the trial court's division of the community estate resulted in him being awarded negative $735,844.39 and Sheryl being awarded $134,487.99. Aside from the debt associated with several trucks, which Byron's business was paying him to lease, and the $80,000 promissory note, which Sheryl claimed to know nothing about, the vast majority of the community debt awarded to Byron can be attributed to his ownership interests in RWE, BW & RR, and Cattlemen's. Specifically, the trial court awarded Byron 100% of the ownership interests in each of the three entities, and according to Ronnie Robertson, Byron's business partner, RWE had a negative net worth of approximately $664,000, BW & RR had a negative net worth of approximately $874,000, and Cattlemen's had a negative net worth of approximately $1.7 million. The divorce decree details the numerous promissory notes that the entities were responsible for paying, and because Byron was a 50% owner of

6

both RWE and BW & RR and a 25% owner of Cattlemen's, this community debt negatively affected Byron's overall recovery. Nevertheless, Robertson explained that much of the debt was incurred as start-up expenses and that the businesses had been hurt by the recent drought, but he said that he wanted to stay in business, pay off the debt, and make money. The trial court awarded Sheryl 0% of the community interest in any of the three entities; thus, while she took on no debt associated with the businesses, she will not be entitled to benefit from them financially like Byron.

The trial court's disproportionate property division is also supported by evidence that Byron committed adultery and, as detailed in the fourth issue, evidence that Byron had treated Sheryl cruelly. *See Murff*, 615 S.W.2d at 699. We also notice that Byron's proposed division of the community estate recommended that the trial court award him negative $710,940—a figure that is substantially similar to the negative $735,844.39 that was actually awarded. Thus, Byron appears to have received almost precisely what he had asked for. We hold that the disproportionate division has a reasonable basis and that the trial court did not abuse its discretion in its division of the community estate. *See* Tex. Fam. Code Ann. § 7.001; *Murff*, 615 S.W.2d at 699. We overrule Byron's second issue.

In his third issue, Byron argues that the trial court erred by ordering him to pay Sheryl $1,000 per month in child support. Byron posits that his net income totals $4,333.33 per month and because twenty percent of that figure is less than

7

$1,000 per month, he complains that the trial court erred by not entering findings explaining the upward deviation from the 20% guideline. *See* Tex. Fam. Code Ann. §§ 154.125(b), .130(a)(3) (West 2014). Although the trial court later entered supplemental findings, Byron complains that they are improper because the trial court had previously recused itself.

Family code section 154.130 requires findings on monthly net resources when the trial court orders an amount of child support that varies from the statutory percentage guidelines. *Id.* §154.130(a)(3). Byron relies on evidence that his monthly net resources are $4,333.33 to arrive at his conclusion that the trial court varied from the statutory guidelines, but the problem with this argument is that there was varying testimony regarding the amount of Byron's monthly net resources. While part of the evidence set the figure at $4,333.33, other evidence—one of Byron's own exhibits—set the figure at $5,895.39. Thus, Byron relies upon a figure at the lower end of the evidentiary spectrum detailing his monthly net resources to conclude that the trial court improperly varied upward from the 20% statutory guideline. A more accurate calculation must consider not just part of the evidence, as Byron urges, but all of it. Twenty percent of the average of the $5,895.39 and $4,333.33 figures equals approximately $1,022—a figure slightly more than what the trial court ordered Byron to pay as child support. *See Norris v. Norris*, 56 S.W.3d 333, 341–42 (Tex. App.—El Paso 2001, no pet.) ("Given the fluctuation in Robin's income, an order based upon the average amount of monthly net resources for the years

8

1997 and 1998 was not an abuse of discretion."). In its original findings of fact, the trial court found that "[t]he amount of child support ordered by the Court is in accordance with the applicable percentage guidelines." The evidence is sufficient to support this finding because the $1,000 in monthly child support ordered by the trial court is within the purview of the $1,022 figure.[2] Accordingly, we hold that the trial court was not required to enter section 154.130 findings and that it did not abuse its discretion in setting the amount of child support. To the extent that the trial court did somehow abuse its discretion, we hold that, in light of the entire record, any error was harmless. *See* Tex. R. App. P. 44.1(a); *Friermood v. Friermood*, 25 S.W.3d 758, 761 (Tex. App.—Houston [14th Dist.] 2000, no pet.). We overrule Byron's third issue.

In his fourth issue, Byron argues that the trial court abused its discretion by dissolving the marriage in part on the ground of cruelty. In addition to many highly offensive text messages that Byron sent Sheryl during the pendency of the divorce, she testified that Byron had choked her numerous times, put a loaded gun to her head, hit her with a belt, hit her while she was pregnant, and threatened to kill her and her parents. Byron denied physically abusing Sheryl, but as the factfinder, the trial court could have resolved the conflicting testimony against Byron. We hold that the trial court did not abuse its discretion by

---

[2]The difference benefits Byron. We also note that the temporary orders required Byron to pay child support in the amount of $1,000 per month. Byron testified that he only paid roughly $5,000 over the course of nineteen months.

9

dissolving the marriage in part on the ground of cruelty.  We overrule Byron's fourth issue.

Having overruled Byron's four issues, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DELIVERED:  June 12, 2014